**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MG DESIGN ASSOCIATES, CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 5166 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| COSTAR REALTY INFORMATION, INC., | ) | |
| APARTMENTS, LLC d/b/a | ) | |
| APARTMENTS.COM, and NORTHWIND | ) | |
| ENTERPRISES, INC. d/b/a ATLANTIC | ) | |
| EXHIBITS, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff MG Design Associates, Corp. ("MG") thought that it was going to design

and build a tradeshow exhibit for Defendants CoStar Realty Information, Inc. ("CoStar") and

Apartments, LLC d/b/a Apartments.com ("Apartments") (collectively the "CoStar Defendants"),

but, after MG designed the exhibit, the CoStar Defendants took MG's designs and asked

Defendant Northwind Enterprises, Inc. d/b/a Atlantic Exhibits ("Atlantic") to build the exhibit

instead. After the Court previously dismissed MG's suit without prejudice, finding that

Defendants possessed sufficient contacts with Illinois to authorize personal jurisdiction but also

finding that MG failed to properly allege a copyright claim and declining to review MG's

pendent state law claims [38], MG filed its First Amended Complaint, alleging breaches of

contract, fraudulent misrepresentation, and tortious interference with both contract and

prospective economic advantage.[1] Defendants now move the Court to revisit its prior decision

regarding personal jurisdiction and to dismiss the First Amended Complaint for failure to state a

---

[1] MG abandoned its copyright infringement claim in violation of the Copyright Act of 1976 (the
"Copyright Act"), 17 U.S.C. § 101 *et seq.*, and now alleges that the Court has subject matter jurisdiction
based on diversity jurisdiction.

claim.  The Court grants in part and denies in part the CoStar Defendants' motion [44],

dismissing Count II for lack of personal jurisdiction but denying the motion to dismiss MG's

other claims against them because MG adequately alleges a claim for breach of contract and

fraudulent misrepresentation.  Because the Court has personal jurisdiction over Atlantic and

because MG plausibly alleges that it had a contract and a business relationship with the CoStar

Defendants, about which Atlantic knew, the Court denies Atlantic's motion [46].  All Defendants

must answer the First Amended Complaint by August 18, 2017.

**BACKGROUND**[2]

MG, an Illinois corporation with its principal place of business in Pleasant Prairie,

Wisconsin, designs and constructs tradeshow exhibits.  From 2000 to 2014, it did this type of

work for exhibits relating to "Apartments.com," a real estate website that was owned by

Classified Ventures, LLC ("Classified Ventures").

In 2014, CoStar, a real estate information company, bought the Apartments.com-related

assets and liabilities from Classified Ventures.  CoStar is a Delaware corporation with its

corporate headquarters in Washington, D.C., Doc. 12-1, Ex. A ¶ 2, operates an office in Chicago,

Illinois, and is registered to do business in Illinois.

CoStar formed Apartments to run the Apartments.com website.  Apartments is a

Delaware limited liability company, and CoStar is Apartments' sole member.  *Id.* ¶¶ 3–4.

Although MG alleges that Apartments' primary office is in Chicago, Apartments' corporate

executives, including its Chief Executive Officer, Executive Vice President of Operations,

---

[2] The facts in the background section are taken from MG's complaint and exhibits attached thereto and are presumed true for the purpose of resolving Defendants' motions to dismiss pursuant to Rule 12(b)(6). *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).  The parties incorporate affidavits from prior motions to dismiss in their arguments, and the Court refers to facts necessary to ruling on Defendants' motions regarding personal jurisdiction Rule 12(b)(2), including facts from affidavits and other materials outside the First Amended Complaint, with citations to relevant source material.

Executive Vice President of Accounting and Finance, and General Counsel and Secretary have "directed, controlled, and coordinated its business from Washington, D.C," *id.* ¶ 7. Apartments' only other corporate officer, its president, resided in Illinois until January 2016. *Id.* ¶ 9. Between April 2014 and the summer of 2015, Apartments maintained its departments for product design and development, multi-family field sales, finance, and customer service in Chicago. *Id.* ¶ 11. Apartments then moved the "majority of [its] departments," including its finance, marketing, and customer service departments, to Atlanta, Georgia between the summer of 2015 and January 2016. *Id.* ¶ 12. It is unclear whether any departments remain in Chicago. *See id* (explaining that majority of departments moved, but not stating that all departments moved).

In April 2015, Sharon Patenaude, who had formerly worked for Classified Ventures and who was now an employee of CoStar after the Apartments.com purchase, contacted MG to design and build an exhibit for an upcoming conference in Las Vegas, Nevada. Between April 22 and 25, 2015, Patenaude was in San Antonio, Texas for a work project. Doc. 35-1 ¶ 4. During that time, Mark Klionsky, a CoStar employee in Washington, D.C. asked Patenaude to commission an exhibit for display in Las Vegas. *Id.* ¶ 5. Klionsky communicated a design idea to Patenaude. *Id.*

Patenaude then called MG's Pleasant Prairie, Wisconsin headquarters to speak with Betty Kasper of MG. Patenaude wanted MG to design an Apartments.com-branded exhibit, making it "clear that Costar and Apartments would engage [MG] for all phases of work." Doc. 39 ¶ 34. MG agreed to work on the Apartments.com exhibit at the traditional rates and costs. The parties, however, did not document their agreement in writing. The parties dispute from where Patenaude's call originated: MG presents evidence from Patenaude that she called MG "from her office in Chicago, Illinois" on or before April 28, 2015. Doc. 31-1 ¶ 7. The CoStar Defendants

3

also present evidence from Patenaude that she called MG "[w]hile still in Texas" between April 22 and 25, 2015, Doc. 35-1 ¶ 7, and had reached out to MG by April 24, Doc. 35-2 ¶ 6 & Ex. 3 (noting that Patenaude had "put [MG] on notice").

Patenaude drove to MG's Pleasant Prairie office on April 27, 2015. Doc. 35-1 ¶ 7. While in the design phase for the exhibit, Patenaude was MG's primary contact. She worked out of Chicago, but because Pleasant Prairie was so close ("about one hour away"), she "preferred to discuss [the exhibit] in person at the Pleasant Prairie office," and "[t]he key discussions about the design . . . occurred at that office." *Id.* ¶ 11. In Wisconsin, Patenaude "discussed the draft design" for about an hour. *Id.* ¶ 7. She raised Klionsky's display ideas, and she also suggested other themes and design necessities. *Id.* ¶ 8. On May 4, Patenaude visited MG's Pleasant Prairie office again, where she viewed MG's initial design renderings and asked for changes. *Id.* ¶ 10; Doc. 35-2 ¶¶ 7–8 & Ex. 4.

On May 7, 2015, MG produced an initial set of design renderings for an Apartments.com exhibit. On May 8, 2015, CoStar employees in Washington, D.C. requested a few changes. Doc. 35-1 ¶ 12. On May 11, 2015, MG revised the design with a second set of design renderings (creating, the "Design Renderings"). MG emailed Patenaude the final copy of the Design Renderings on May 11.

At some point during the week of May 11, Klionsky called Patenaude and told her that CoStar was not going to work with MG anymore, that another design firm would begin work on the Apartments.com exhibit for the Las Vegas conference, and that Patenaude was not going to work on the Las Vegas conference anymore either. *Id.* ¶ 13. On May 13, 2015, CoStar told MG that Patenaude was out and that CoStar was "terminating its business relationship with [MG] and that [MG] would not be performing any work for the production phase" for the Las Vegas

exhibit. Doc. 39 ¶¶ 43–44. MG then sent an invoice for the design work to Patenaude in Chicago, which stated that no one could copy or use the Design Renderings without MG's approval. *Id.* ¶ 47; Doc. 39-2; Doc. 31-1 ¶ 11. CoStar paid MG $16,500 for MG's work on the Design Renderings. Atlantic then built a physical exhibit at the Las Vegas conference (the "Las Vegas Exhibit"), using the Design Renderings "as the basis" for the construction. Doc. 39 ¶ 48.

Atlantic advertised on its website that it designed the Las Vegas Exhibit. The Design Renderings, however, bore a legend on each page stating "[a]ll designs and ideas . . . are the creative property of [MG]," *id.* ¶ 40, the paid invoice stated that the Design Renderings "remain the property of [MG]," *id.* ¶ 47, and both the invoice and the Design Renderings stated that they "may not be reproduced in any manner without the express approval of [MG]," *id.* ¶¶ 40, 47; Doc. 39-1; Doc. 39-2. MG never received a request from anyone to use the Design Renderings or to construct exhibits based on the Design Renderings.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(2) challenges whether the Court has jurisdiction over a party. The party asserting jurisdiction has the burden of proof. *See Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). The Court may consider affidavits and other competent evidence submitted by the parties. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If the Court rules on the motion without a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). The Court will "read the complaint liberally, in its entirety, and with every inference drawn in favor of" the plaintiff. *Central States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006) (quoting *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1393 (7th Cir. 1993)). "[O]nce the

5

defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction," however, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783. Any dispute concerning relevant facts is resolved in the plaintiff's favor. *Id.* at 782–83.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

# ANALYSIS

## I.     Revisiting Personal Jurisdiction

Defendants again challenge whether the Court can exercise personal jurisdiction.  The CoStar Defendants move the Court to reconsider its prior order finding personal jurisdiction, and Atlantic moves to dismiss due to lack of personal jurisdiction.  MG opposes both arguments. Thus the Court must determine whether the issue of personal jurisdiction is reviewable and, if it is, the proper standard for the Court's review.

Courts have held that if the plaintiff amends the complaint and adds new allegations after a previous ruling on personal jurisdiction in the plaintiff's favor, then the court can review the issue of personal jurisdiction again.  *E.g., Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 757 F. Supp. 2d 904, 911–12 (W.D. Mo. 2010) (addressing personal jurisdiction arguments in motion to dismiss amended complaint, despite previously finding personal jurisdiction over parties based on prior complaint, because ruling on personal jurisdiction was interlocutory in nature and by amending the complaint and adding new allegations, the plaintiffs had further developed facts regarding personal jurisdiction); *see also Gregory v. Preferred Fin. Sols.*, No. 5:11-CV-422 MTT, 2013 WL 5725991, at *9 (M.D. Ga. Oct. 21, 2013) (acknowledging that if the defendants desired to again challenge personal jurisdiction following the plaintiff's planned amended complaint, they could do so by renewing motion to dismiss the amended complaint).

"A ruling declining to dismiss for lack of personal jurisdiction is, by its nature, interlocutory in nature." *Hallmark Cards, Inc.*, 757 F. Supp. 2d at 911 (citing *Dakota Indus. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991)); *Abelesz v. OTP Bank*, 692 F.3d 638, 661 (7th Cir. 2012) (noting that an order finding personal jurisdiction over a defendant is an interlocutory decision absent final judgment).  Courts can revisit an interlocutory decision.  *See*

Fed. R. Civ. P. 54(b); *see also Hammer & Steel, Inc. v. K & S Engineers, Inc.*, No. 14-CV-10001, 2017 WL 569122, at *3 (N.D. Ill. Feb. 13, 2017) (addressing request for reconsideration raised by the plaintiff in its response to a motion rather than in a motion for reconsideration). Therefore, reconsideration of a ruling on personal jurisdiction is appropriate. *See Mueller ex rel. Mueller v. Mueller*, No. 02 C 488, 2002 WL 338874, at *2 (N.D. Ill. Mar. 4, 2002) (reconsidering personal jurisdiction upon further record after previously denying defendant's 12(b)(2) motion to dismiss).

MG also has filed an amended complaint, which contains new claims and new substantive allegations. An amended complaint "completely supersedes all prior pleadings, and it is well-settled that defendants are entitled to use the same clean slate that plaintiffs are afforded when amendment is permitted." *Vasich v. City of Chicago*, No. 11 C 04843, 2013 WL 80372, at *10 (N.D. Ill. Jan. 7, 2013). MG takes advantage of its clean slate, alleging new claims and adding new factual allegations in the First Amended Complaint. And MG provides additional argument in its opposition to Defendants' pending motions, arguing that the Court can exercise general jurisdiction even though MG did not devote attention to that argument in response to Defendants' motions to dismiss MG's original complaint.

The Court finds no issue with Rule 12(g)(2), which "requires litigants to consolidate certain dismissal arguments in a single motion." *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012). Under Rules 12(g) and 12(h), a party who files a Rule 12 motion may not file another Rule 12(b)(2) motion that raises a defense or objection that could have been raised before but was not. *Id.*; *see also* Fed. R. Civ. P. 12(h)(1) (explaining that motions under Rules 12(b)(2)–(5) are waived if not filed initially with other motions required by Rule 12(g)(2)). But courts have interpreted these rules as bars to "piecemeal litigation of defenses." *E.g., GlaxoSmithKline*

*Biologicals, S.A. v. Hospira Worldwide, Inc.*, No. 13-CV-04346, 2013 WL 5966918, at *2 (N.D. Ill. Nov. 7, 2013) (analyzing *Ennenga*). Here, there is nothing piecemeal about the sequence of Defendants' defenses, and it would not make sense to bar a new 12(b)(2) motion. After the Court dismissed MG's original complaint without prejudice (after first determining that the Court had personal jurisdiction over Defendants based on the dismissed claims), MG filed the First Amended Complaint, raising new claims and pleading new facts that will be reviewed for the first time under a personal jurisdiction analysis. The Court sees no bar to review of personal jurisdiction under the motion to dismiss standard.

Still, the parties debate the proper method for addressing personal jurisdiction as it relates to the First Amended Complaint—as discussed, MG, CoStar, and Apartments want the Court to review its prior order on personal jurisdiction for error under the motion for reconsideration standard, and Atlantic asks the Court to review personal jurisdiction under the motion to dismiss standard. Some courts have chosen the motion for reconsideration standard after the denial of a Rule 12(b)(2) motion to dismiss the prior complaint, treating the defendant's second attempt to challenge personal jurisdiction as a motion for reconsideration because the Federal Rules of Civil Procedure bar a successive Rule 12(b)(2) motion. *See Allen ex rel. Allen v. Devine*, 726 F. Supp. 2d 240, 257–58 (E.D.N.Y. 2010) (finding that the defendant's second motion to dismiss pursuant to 12(b)(2) had to be filed as a motion for reconsideration because Rules 12(g)(2) and 12(h)(1) prohibited another Rule 12(b)(2) motion, noting that the plaintiff did not amend claims against the moving defendant); *see also Mueller*, 2002 WL 338874, at *2 (addressing the defendant's motion to reconsider personal jurisdiction after previously denying the defendant's motion to dismiss for lack of personal jurisdiction). Other courts have chosen the motion to dismiss standard, considering a defendant's second challenge to personal jurisdiction following an

amended complaint as a Rule 12(b)(2) motion to dismiss. *See, e.g.*, *Hallmark Cards, Inc.*, 757 F. Supp. 2d at 911 (acknowledging interlocutory review of prior finding of personal jurisdiction over defendants but still treating challenge to personal jurisdiction as a Rule 12(b)(2) motion to dismiss rather than as a motion for reconsideration).

The Court determines that personal jurisdiction should be reviewed under the motion to dismiss standard. The Court does not find that the Federal Rules of Civil Procedure bar a Rule 12(b)(2) motion in this situation: the First Amended Complaint wiped clean the parties' procedural positions and Defendants thus have an opportunity to raise new Rule 12(b)(2) arguments. The First Amended Complaint also changes the grounds on which the Court previously ruled on personal jurisdiction; MG adds new facts and claims to the amended complaint, which the Court did not consider in its prior analysis. The Court's truncated its analysis of personal jurisdiction regarding the original complaint's state law claims. Finally, practicality and judicial efficiency also suggest that the Court should fully re-analyze personal jurisdiction rather than just review its prior ruling for error: while the CoStar Defendants ask for reconsideration, Atlantic does not (and explicitly refused to partake in such an analysis when suggested by MG). Further all three Defendants and MG put forth arguments that are amenable to review under Rule 12(b)(2).[3] Therefore, for the foregoing reasons, the Court reviews personal jurisdiction and addresses Defendants' arguments as if they were made under Rule 12(b)(2).

## II. Personal Jurisdiction Arguments

In diversity cases, the Court may exercise personal jurisdiction over a defendant only if personal jurisdiction would be proper in an Illinois court. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Illinois allows for personal jurisdiction to the full extent authorized by

---

[3] For example, in their motion for reconsideration, the CoStar Defendants argue that there is no personal jurisdiction over MG's oral contract claim against them, but MG added that claim in the First Amended Complaint; thus, the Court cannot reconsider a ruling it has not yet made.

the Illinois and United States Constitutions. *KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725

F.3d 718, 732 (7th Cir. 2013). To the extent the federal constitutional and Illinois statutory

inquiries diverge, "the Illinois constitutional standard is likely more restrictive than its federal

counterpart," but both essentially focus on whether exercising jurisdiction over a defendant is

fair and reasonable and thus a single inquiry suffices. *Id.*; *C.H. Johnson Consulting, Inc. v.*

*Roosevelt Rds. Naval Station Lands & Facilities Redevelopment Auth.*, No. 1:12-cv-08759, 2013

WL 5926062, at *2 (N.D. Ill. Nov. 5, 2013) ("In light of the Seventh Circuit's assessment in

*Hyatt* and the absence of post-*Rollins* [*v. Elwood*, 565 N.E.2d 1302, 1315 (Ill. 1990)] guidance

from the Illinois courts as to how Illinois and federal law may differ as a practical matter in

regard to personal jurisdiction, a single due process inquiry will suffice."). In order to satisfy the

Due Process Clause, the defendant must have "certain minimum contacts with [the forum state]

such that the maintenance of the suit does not offend 'traditional notions of fair play and

substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed.

95 (1945) (quoting *Millikin v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)).

Minimum contacts exist where "the defendant's conduct and connection with the forum State are

such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*

*Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1984).

### A.    General Jurisdiction

"[A] court may assert general jurisdiction over foreign (sister-state or foreign-country)

corporations to hear any and all claims against them when their affiliations with the State are so

'continuous and systematic' as to render them essentially at home in the forum State." *BNSF Ry.*

*Co. v. Tyrrell*, --- U.S. ----, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler AG v.*

*Bauman*, --- U.S. ----, 134 S. Ct. 624, 754, 187 L. Ed. 2d 624 (2014)). A defendant is subject to

general jurisdiction only where its contacts with the forum state are so substantial that it can be considered "at home" in the state. *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011); *see also Tamburo*, 601 F.3d at 701 ("The threshold for general jurisdiction is high; the contacts must be sufficiently extensive and pervasive to approximate physical presence."). Typically, corporations are found to be at home only in "the state of the corporation's principal place of business and the state of its incorporation." *Kipp*, 783 F.3d at 698. And "in an 'exceptional case,' a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *BNSF Ry. Co.*, 137 S. Ct. at 1558 (quoting *Daimler*, 134 S. Ct. at 761 n. 19) (noting that an event that forces a corporation to relocate its operations to the forum opens that corporation up to general jurisdiction in the forum (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S. Ct. 413, 96 L. Ed. 485 (1952)).

MG argues that the Court can exercise general jurisdiction over the CoStar Defendants.[4] CoStar is a Delaware corporation and maintains its headquarters in Washington, D.C. Apartments is a Delaware limited liability company (its sole member being CoStar during the events in question). The states of incorporation of the CoStar Defendants do not further MG's argument regarding general jurisdiction.

The Court can exercise general jurisdiction over the CoStar Defendants if they have corporate affiliations "so 'continuous and systematic' as to render [them] essentially at home" in Illinois. *Daimler AG*, 134 S. Ct. at 761 (2014) (quoting *Goodyear*, 564 U.S. at 919). MG alleges that Apartments' "primary office" is in Illinois, Doc. 39 ¶ 12, but it presents no evidence to dispute that Apartments' corporate officers "directed, controlled, and coordinated its business

---

[4] MG pleaded that Atlantic is a Virginia corporation and that Atlantic's principal place of business is in Virginia. *See* Doc. 39 ¶ 13. MG does not attempt to establish a *prima facie* case that the Court should exercise general jurisdiction over Atlantic.

from Washington, D.C." Doc. 12-1 Ex. A ¶ 7. Nor does MG present any evidence to dispute CoStar's associate general counsel's declaration that CoStar's principal place of business is in Washington, D.C. *See id.* ¶ 2.

The CoStar Defendants would have the Court stop there and declare that there is no general jurisdiction because they are not incorporated and did not maintain their principal places of business in Illinois at the time of suit. They point to the Supreme Court's nerve center test used to establish diversity jurisdiction. *See Hertz Corp. v. Friend*, 559 U.S. 77, 92–93, 130 S. Ct. 1181, 1192, 175 L. Ed. 2d 1029 (2010) (noting that a corporation's "nerve center," where its officers direct, control and coordinate the corporation's activities, and not just "where the corporation holds its board meetings" is the best way to determine a corporation's "principal place of business"). But "[t]he exercise of general jurisdiction is not limited to" the state of incorporation or the corporation's principal place of business, which are "'paradigm' forums" where a plaintiff will always know it can file suit against a corporation—but not the only places where a corporation can be at home for purposes of general jurisdiction. *BNSF Ry. Co.*, 137 S. Ct. at 1558 (quoting *Daimler AG*, 134 S. Ct. at 760); *Daimler AG*, 134 S. Ct. at 760 ("*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums.").

MG argues that this is the exceptional case where the CoStar Defendants are also at home in Illinois because the CoStar Defendants have physical offices in Illinois, are registered to do business in Illinois, and kept key employees in Illinois (including Patenaude and Apartments' corporate president). Turning first to CoStar, its key employee, Patenaude, operated out of Illinois. CoStar also has a physical office in Illinois and is registered to do business in Illinois as

13

well. But Patenaude was an employee for a discrete subject matter, not global operations, and CoStar's corporate and physical presence in Illinois does not override its corporate operations out of Washington, D.C. *Cf. Dynatrace LLC v. Ramey*, No. 16-CV-01777-EMC, 2016 WL 7157650, at *5 (N.D. Cal. Dec. 8, 2016) (finding corporation at home in district because of its continuous and systematic affiliation with the district including listing the district as its location, keeping one of its "dual headquarters" in the district, registering to do business in the district, and placing its chief executive officer in the district). Further, "registering to do business . . . is not enough to confer general jurisdiction over a foreign corporation." *Perez v. Air & Liquid Sys. Corp.*, No. 316CV00842NJRDGW, 2016 WL 7049153, at *6 (S.D. Ill. Dec. 2, 2016) (collecting cases, reviewing Illinois corporate registration statutes). MG fails to show that CoStar was operating in Illinois with the type of continuous and systematic operation to be at home here. The Court declines to exercise general jurisdiction over CoStar.

Whether the Court can exercise general jurisdiction over Apartments is a closer question. Apartments' president was in Illinois through 2016, Apartments maintained its primary office in Illinois until it moved the majority of its operations to Georgia, and Apartments is registered to do business in Illinois. These facts suggest the Court should exercise general jurisdiction. *Cf. Goodyear*, 564 U.S. at 921 ("[P]etitioners are not registered to do business in North Carolina . . . have no place of business, employees, or bank accounts in North Carolina . . . do not design, manufacture, or advertise their products in North Carolina [and] do not solicit business in North Carolina or themselves sell or ship tires to North Carolina customers."). But the time frame of these jurisdictional facts about Apartments is important. *Dolemba v. Citizens Info. Assocs., LLC*, No. 13 C 6939, 2014 WL 1646942, at *3 (N.D. Ill. Apr. 24, 2014) (analyzing general jurisdiction "at present"); *Hartford Cas. Ins. Co. v. Foxfire Printing & Packaging, Inc.*, No. 10 C 50298,

2011 WL 4345850, at *4 (N.D. Ill. Sept. 15, 2011) (noting contacts must continue "up to the time of suit"). CoStar formed Apartments to absorb the Apartments.com business that Classified Ventures, LLC sold to CoStar. After that sale and Apartments' formation, Apartments' officers "directed, controlled, and coordinated its business from Washington, D.C." Doc. 12-1 Ex. A ¶ 7. Apartments then moved the majority of its departments and its corporate president to Georgia by January 2016, before MG filed this lawsuit. These facts indicate that Chicago was not Apartments' chosen home: Apartments operated out of Illinois initially because it was absorbing the Apartments.com business, but Apartments did not want a home in Illinois because its officers controlled Apartments from Washington, D.C. and Apartments moved most of its operations to Georgia. Even though Apartments maintains some operations in Illinois and is registered to do business in Illinois, MG has not shown that at the time of this suit, Apartments had the type of contacts with Illinois to extend general jurisdiction over it. The Court, therefore, will not exercise general jurisdiction over Apartments.

### B.     Specific Jurisdiction

Specific jurisdiction is "case-linked." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco County*, --- U.S. ----, 137 S. Ct. 1773, 1780 (2017) (quoting *Goodyear*, 564 U.S. at 919). That is "the suit must arise out of or relate to the defendant's contacts with the forum." *Id.* (quoting *Daimler*, 134 S. Ct. at 754). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting Goodyear, 564 U.S. at 919). Specific jurisdiction requires a nexus between the forum-related conduct and the underlying cause of action. *Felland v. Clifton*, 682 F.3d 665, 676 (7th Cir. 2012). The Court can exercise specific jurisdiction "when the defendant purposefully directs its activities at the forum

state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). However, a defendant is not subject to jurisdiction solely because the plaintiff suffered injury in the forum state. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014).

### 1.     Breach of Contract (the CoStar Defendants)

MG first alleges that the CoStar Defendants breached two different contracts with MG. "[I]n a breach of contract case, it is only the 'dealings between the parties in regard to the disputed contract' that are relevant to minimum contacts analysis." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997) (quoting *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 153 (3d Cir. 1996)).  Courts in this District often look to several factors "including (1) whether the contract was negotiated or executed in Illinois and whether it was to be performed in Illinois; (2) whether payment was to be made in Illinois; (3) whether the defendant was ever physically present in Illinois in connection with the contract; (4) whether the Illinois plaintiff or the out of state defendant initiated the transaction; (5) and the occurrence of telephone calls or other communications to and from Illinois." *AS Engine Leasing, LLC v. Vision Airlines, Inc.*, No. 14 C 1436, 2014 WL 6461760, at *3 (N.D. Ill. Nov. 18, 2014) (citing *Citadel Grp. Ltd. v. Merle West Med. Ctr., Inc.,* No. 06–C–6162, 2007 WL 5160444, at *3 (N.D. Ill. June. 13, 2007)).

### a.     Breach of Oral Contract

MG first alleges that the CoStar Defendants breached an oral contract with MG for MG to design and then build an Apartments.com-branded exhibit at the Las Vegas, Nevada trade show.  MG was to design the project in Wisconsin and then build the exhibit in Nevada.  MG

and the CoStar Defendants disagree about where Patenaude negotiated and formed the oral contract with MG—MG alleges and provides some evidence that Patenaude negotiated the deal while she was in Illinois, and the CoStar Defendants provide evidence that Patenaude formed the contract while she was visiting Texas for a conference.

But regardless of where Patenaude initiated the call, Patenaude worked in Illinois for Apartments' trade show group, and Klionsky chose her to do more than make a phone call. It is reasonable to infer that the CoStar Defendants' Illinois-based tradeshow operation was involved in negotiating the oral contract. It is also reasonable to infer that Patenaude relied on her relationship with MG, which was established from her work in her Illinois office as a Classified Ventures employee, to reach out to MG for the project. "[P]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). An ongoing "commercial relationship involving repeated transactions over time" is not automatically relevant but past contacts can be relevant if they "bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract." *RAR, Inc.*, 107 F.3d at 1278. MG alleges that the oral contract was informed by its prior deals with Patenaude, so it is reasonable to infer that Patenaude's past work in Illinois bears on the disputed breach of oral contract involving the CoStar Defendants.

Further, while Patenaude did travel to Wisconsin to review work performed under the oral contract, she primarily did her job in Illinois, and it is reasonable to infer that she had some involvement with the project while working in Illinois. It is also reasonable to infer that the

17

CoStar Defendants knew that Patenaude would be receiving some of the fruits of the oral contract (the Design Renderings) at her office in Illinois. *See* Doc. 31-1 ¶ 10 (noting that designs were emailed to Patenaude and opened at her Chicago office). The Court finds that MG has established a *prima facie* case that MG's claim for breach of oral contract arises from and relates to the CoStar Defendants' purposeful contacts with Illinois. The Court also finds that because the CoStar Defendants had established personnel in Illinois and that establishment connects to the alleged breach of contract, the exercise of personal jurisdiction would not offend notions of fair play and justice.

### b.      Breach of Written Contract

MG also alleges that the CoStar Defendants breached a written contract with MG by violating the terms of the invoice that MG sent for the Design Renderings. MG alleges that the CoStar Defendants agreed not to use or reproduce the Design Renderings without MG's permission but did so anyway. MG alleges that this written contract was performed after it sent Patenaude the invoice to her office in Illinois. But MG's activities are not relevant. *See Walden v. Fiore*, --- U.S. ----, 134 S. Ct. 1115, 1122, 188 L. Ed. 2d 12 (2014) (holding that the plaintiff's contacts with the forum cannot alone establish contacts by the defendant). Further, MG knew that Patenaude would not be handling the invoice—a CoStar employee in Washington, D.C. informed MG that Patenaude would no longer oversee tradeshows. CoStar's payment of the invoice, the alleged act of acceptance of the invoice's contractual terms, was made from Washington, D.C. directly to MG's office in Wisconsin. The CoStar Defendants then commissioned Atlantic to build the Subject Exhibit in Nevada.

The CoStar Defendants may have had sufficient activities in Illinois to establish minimum contacts with the State, but MG's claim of breach of written contract does not arise out

of or relate to those acts that create minimum contacts.  MG initiated the written contract offer by sending it to Illinois, but, after that, the CoStar Defendants' alleged acts giving rise to the claim—both the alleged acceptance and the breach—did not relate to Illinois.  CoStar was operating out of Washington, D.C., and had removed Patenaude, who was in Illinois, from further tradeshow work.  Apartments' operations may still have been in Illinois, but it is unclear what relevance Illinois has where Patenaude was no longer involved.  Unlike the original complaint, the First Amended Complaint makes clear that MG initiated the written contract that is subject of the claim in Count II by sending the invoice for the Design Renderings.  Thus, the prior relationship and oral contract negotiations have no bearing on MG's breach of written contract claim in the First Amended Complaint.

While the Court previously found that the CoStar Defendants' contacts with Illinois were sufficient for specific jurisdiction over the breach of written contract claim because their operations in Illinois were directly related to MG's breach of contract claim, the Court finds that the CoStar Defendants' Illinois operations do not relate to Count II of the First Amended Complaint.  The Court finds that it cannot exercise specific jurisdiction over MG's breach of written contract claim in the First Amended Complaint, and dismisses that claim without prejudice to refiling in another jurisdiction.

### 2. Fraudulent Misrepresentation (the CoStar Defendants)

MG also alleges that the CoStar Defendants fraudulently misrepresented to MG that MG would have a larger role in the Las Vegas exhibit, including building the exhibit at the trade show.  Like the breach of oral contract claim, this claim arises from Patenaude's work in Illinois.  Although the CoStar Defendants have presented evidence that Patenaude made the representation from Texas, MG presents enough evidence and allegations that suggest that the

CoStar Defendants directed activities at Illinois — CoStar's Washington, D.C. employee reached out to Patenaude, typically stationed in Illinois for work on Apartments.com-related tradeshows, to have her convince MG to design an exhibit for the CoStar Defendants that they knew MG would not be allowed to build. MG therefore establishes a *prima facie* case of specific jurisdiction regarding the alleged fraudulent misrepresentation, and such an exercise of jurisdiction would not violate traditional notions of fair play and justice.

### 3. Tortious Interference (Atlantic)

Finally, MG alleges that Atlantic tortiously interfered with MG's ongoing contractual relationship with the CoStar Defendants and interfered with future potential deals that MG expected with the CoStar Defendants. Atlantic argues that there is no connection between Illinois and MG's claims against Atlantic. Previously, the Court found that MG alleged that Atlantic interfered with MG's contract and business relationship by taking MG's intellectual property (assumed to be held in Illinois because MG was an Illinois corporation) and exploiting it to the detriment of MG's contractual and expected business relationship with the other Defendants.

The First Amended Complaint adds forum-specific allegations in the claims against Atlantic: MG alleges that Atlantic, the Virginia-based competitor of Illinois corporation MG, interfered with MG's contractual relationship and expected future business relationship with the CoStar Defendants' Illinois-based tradeshow operations by taking and using MG's design, created in Wisconsin, and reproducing that design in Virginia and Nevada and then falsely advertising Atlantic's creation of the design on Atlantic's website. "[T]he plaintiff cannot be the only link between the defendant and the forum." *Advanced Tactical Ordnance Sys., LLC*, 751 F.3d at 802 (quoting *Walden*, 134 S. Ct. at 1122). And Atlantic is correct that specific

jurisdiction is not appropriate simply because MG is incorporated in Illinois. *See id.* at 802 (noting that personal jurisdiction was not proper just because the defendant knew that the plaintiff was an Indiana company and could foresee that its acts would harm the plaintiff in the state). Yet MG alleges that Atlantic's unlawful acts connect to Illinois beyond just MG's state of incorporation.

Atlantic broke up an Illinois-connected business relationship and did so by taking an Illinois corporation's intellectual property and using that intellectual property to encourage co-Defendants CoStar and Apartments to breach their prior agreements with MG, namely: (1) to allow MG to build the Apartments.com exhibit at the Las Vegas tradeshow and (2) to refrain from using MG's designs without permission. MG no longer seeks to hold Atlantic liable for copyright infringement, but MG's allegations otherwise remain the same — by taking MG's designs, Atlantic "deliberately set out to trade on the reputation and goodwill of an Illinois entity that it knew or had good reason to know had built its reputation and would feel an injury in Illinois." *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191 F. Supp. 3d 790, 800 (N.D. Ill. 2016). The Court finds that it can exercise specific jurisdiction over Atlantic not because MG alleges that it felt harm in Illinois as an Illinois-incorporated entity but because MG alleges that Atlantic interfered with MG's contracts and business relationships, established between MG and the CoStar Defendants' Illinois-based tradeshow operations, by unlawfully using MG's property and tarnishing MG's goodwill and reputation.

Atlantic argues that there is no personal jurisdiction because MG no longer alleges a copyright claim. But regardless of whether MG alleges that Atlantic's acts constituted copyright infringement, MG still alleges the same wrong acts that the Court previously found constituted the type of tortious act that allow the Court to exercise specific jurisdiction over Atlantic.

Nor would this exercise of specific personal jurisdiction violate the notions of fair play and substantial justice. MG alleges that Atlantic interfered with MG's contract and business relationship with the CoStar Defendants by taking MG's work. Although MG cannot state a claim for copyright infringement, it still alleges that Atlantic's decision to misuse MG's intellectual property constituted tortious interference. "As a matter of policy, the law ought not require a holder of intellectual property . . . to go to the home forum of one who has, in effect, reached into the holder's home forum to take its property." *Id.* (quoting *Ariel Invs., LLC v. Ariel Capital Advisors LLC*, No. 15 C 3717, slip op. at 5 (N.D. Ill. Oct. 29, 2015)). Therefore, the Court finds that MG has adequately alleged a basis for the Court to assert personal jurisdiction over Atlantic for the tortious interference claims.

Therefore, the Court grants in part and denies in part Defendants' motions as to lack of personal jurisdiction, dismissing Count II's breach of written contract claim against the CoStar Defendants for lack of personal jurisdiction.

## III. Motion to Dismiss for Failure to State a Claim

Defendants also move to dismiss MG's state law claims for failure to state a claim. "As a federal court sitting in diversity, [the Court applies] state substantive law and federal procedural law." *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). The parties have not raised choice of law issues or pointed out any material differences between the substantive laws of Wisconsin, Washington, D.C., Virginia, or Illinois,[5] so the Court will "apply the substantive law of Illinois, the forum state." *Id.*

---

[5] The parties do not debate choice of law regarding the motions to dismiss the First Amended Complaint, and all cite Illinois substantive law.

### A.     Breach of Oral Contract against the CoStar Defendants (Count I)

In Count I, MG alleges that the CoStar Defendants breached Patenaude's oral agreement with MG to design and build the exhibit at the Las Vegas tradeshow. "To state a claim for breach of contract under Illinois law, a party must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *People ex. rel. Acting Dir. of Ins., Jennifer Hammer v. Twin Rivers Ins. Co. f/k/a Cherokee Ins. Co.*, No. 16 C 7371, 2017 WL 2880899, at \*3 (N.D. Ill. July 5, 2017).

The CoStar Defendants argue that MG's claim fails because the First Amended Complaint does not explain the terms of the oral agreement with enough specificity to allege a contract. Under Illinois law, "[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Bogie v. PAWS Chicago*, 914 F. Supp. 2d 913, 916 (N.D. Ill. 2012) (quoting *DiLorenzo v. Valve & Primer Corp.*, 807 N.E.2d 673, 678, 347 Ill. App. 3d 194, 283 Ill. Dec. 68 (2004)). MG alleges that the oral contract was for the work necessary to create an exhibit at Las Vegas, including the design, building, and construction of the exhibit. The CoStar Defendants argue that because the trade show exhibit was a custom job, the parties needed to agree on more specifics about the scope of MG's work. But they cite to post-discovery opinions and ask for evidence only required at summary judgment and trial, *see* Doc. 45 at 14 (citing *Welsh v. Heritage Homes of DeLaWarr, Inc.*, No. CIV. A. 1901-VCN, 2008 WL 442549, at \*9 (Del. Ch. Feb. 15, 2008) (ruling on summary judgment motion); *Leopold v. Kimball Hill Homes Fla., Inc.*, 842 So. 2d 133, 136–37 (Fla. Dist. Ct. App. 2003) (reviewing post-trial judgment)), and, at the pleading

stage, MG's allegations set forth a plausible claim that the parties reached agreement on the essential terms of the design and construction.[6]

The CoStar Defendants also argue that MG fails to allege the price of its work. MG alleges that it agreed to charge its standard rates and costs. "[C]ustomary rates have been found to be sufficiently definite substitutes for an unknown price term when there is a common trade practice." *Sweig v. ABM Indus., Inc.*, No. 08 CV 0271, 2008 WL 2520416, at *6 (N.D. Ill. June 20, 2008) (collecting cases). Although the CoStar Defendants argue that they did not have the relationship with MG necessary to provide notice of the customary rates and costs that MG would charge, MG alleges that Patenaude had a long relationship with MG from her prior work for Classified Ventures, and it is reasonable to infer that she would have known MG's standard rates and costs. Therefore, MG plausibly alleges that the parties had an "objectively ascertainable" method for calculating price. *See Blue Cross & Blue Shield Ass'n v. UHS of Delaware, Inc.*, No. 12 C 8196, 2014 WL 1848653, at *7 (N.D. Ill. May 8, 2014) (finding that an alleged oral agreement for design contained definite and certain pricing because, although the agreement did not specify a price, the agreement specified an objective method for determining the price).

The CoStar Defendants also argue that the United Commercial Code's ("UCC") statute of frauds bars the oral contract because it was a contract for the delivery of goods. The UCC's statute of frauds states that "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his

---

[6] The CoStar Defendants also imply that the invoice contract superseded the prior oral contract's terms. Discovery will determine if that is true, but for now the Court takes as true MG's allegations that the parties into entered an oral contract for design and construction of the tradeshow exhibit. *See Act II Jewelry, LLC v. Wooten*, No. 15 C 6950, 2016 WL 3671451, at *4 (N.D. Ill. July 11, 2016) (noting that the defendant's argument that the contract was superseded was an argument to be made after discovery).

24

authorized agent or broker." 810 Ill. Comp. Stat. 5/2-201(1). The UCC's statute of frauds "applies to transactions in goods." 810 Ill. Comp. Stat. 5/2-102. "Where there is a mixed contract for goods and services, there is a 'transaction in goods' only if the contract is predominantly for goods and incidentally for services." *Brandt v. Boston Sci. Corp.*, 792 N.E.2d 296, 299, 204 Ill. 2d 640, 275 Ill. Dec. 65 (2003) (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194, 199 Ill. 2d 325, 264 Ill. Dec. 283 (2002)). "If the contract is predominantly for goods, then the entire contract falls within the ambit of UCC Article 2. If it is primarily a contract for services, then the entire contract must be tested by common-law standards." *Respect Inc. v. Comm. on Status of Women*, 781 F. Supp. 1358, 1363–64 (N.D. Ill. 1992) (citations omitted). MG alleges that it agreed to design an exhibit and then build and set up the exhibit based on that design work, which suggests MG's design work was more important than its construction. A contract for the design and construction of a tradeshow exhibit is likely one predominantly for the sale of services, not goods, because the dominant purpose of the contract was to utilize the plaintiff's tradeshow "inceptional and design" skills. *Care Display, Inc. v. Didde-Glaser, Inc.*, 589 P.2d 599, 605–06 (Kan. 1979). Because at this stage it plausibly appears that MG alleges an agreement mostly for services, the Court will not apply the UCC's statute of frauds. Therefore, the Court denies the CoStar Defendants' motion to dismiss Count I.

### B.     Fraudulent Misrepresentation against the CoStar Defendants (Count III)

In Count III, MG alleges that the CoStar Defendants fraudulently misrepresented the work that MG would perform, tricking MG into designing the Design Renderings "on a rush basis, without up-front payment, with the expectation that the amount would be billed later along with the other work to be performed." Doc. 39 ¶ 77. "In order to state a claim for fraudulent

misrepresentation, a plaintiff must allege (1) a false statement of material fact; (2) knowledge or belief of the falsity by the party making the statement; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damages resulting from that reliance." *Brown v. Skyline Furniture Mfg., Inc.*, No. 17-CV-1244, 2017 WL 2536590, at *2 (N.D. Ill. June 12, 2017) (citing *Dloogatch v. Brincat*, 920 N.E.2d 1161, 1166, 396 Ill. App. 3d 842, 336 Ill. Dec. 571 (2009)).

The CoStar Defendants first challenge whether MG alleges any fraudulent statement with specificity. "Rule 9(b) requires the plaintiff to specifically allege the who, what, where, and when of the alleged fraud." *Trs. of Will County Carpenters Health And Welfare Fund v. F.V.E. & Assocs., Inc.*, No. 00 C 7685, 2001 WL 1571458, at *2 (N.D. Ill. Dec. 4, 2001). CoStar and Apartments question whether MG has alleged with particularity the alleged Patenaude statement that "'made' it clear that the [CoStar Defendants] would engage [MG] for 'all phases of work' on the exhibit." Doc. 45 at 11. MG, however, alleges that Patenaude told MG that they would "design, fabricat[e], install[ ], dismantle, [provide] technical support, and [provide] ongoing program management" for the exhibit. Doc. 39 ¶ 75; *see also id.* ¶ 34. CoStar and Apartments also question "when the alleged representations occurred" and "where and how [CoStar and Apartments] communicated their intentions to MG Design (e.g., in person, by phone, or by email)." Doc. 45 at 12. MG alleges that after Patenaude communicated across states with MG "about designing, producing, and managing exhibits," she then traveled to MG's Wisconsin office and "made it clear" that MG would engage in "all phases of work" in order to procure MG's work. Doc. 39 ¶¶ 33–34. MG's allegations sufficiently detail Patenaude's alleged misrepresentation, when it occurred, and how it was made.

The CoStar Defendants also argue that MG fails to allege that MG suffered any damages as a result of MG's reliance on Patenaude's misrepresentation. MG must allege out-of-pocket losses that resulted from the CoStar Defendants' misrepresentation. *Triumph Packaging Grp. v. Ward*, 877 F. Supp. 2d 629, 648 (N.D. Ill. 2012); *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 933, 339 Ill. App. 3d 177, 274 Ill. Dec. 152 (2003). MG alleges that it performed rush work without pre-payment "with the expectation that the amount would be billed later along with the other work to be performed." Doc. 39 ¶ 77. Yes, MG alleges that CoStar paid MG for all that work. *See id.* ¶ 45 (in response to receiving MG's invoice for the Design Renderings, "Costar paid MG Design $16,500 for the design work."). But MG also alleges that it rushed its work to get the Design Renderings done and expected other work too. These are sufficient allegations to put the CoStar Defendants on notice that MG seeks losses attributable to the CoStar Defendants' misrepresentations, including MG's "including the loss of its time and resources in preparing." *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 274 (7th Cir. 1996); *Chancellor v. Bank of Am. N.A.*, No. 14-CV-7712, 2015 WL 5730103, at *5 (N.D. Ill. Sept. 29, 2015) (finding that the plaintiff's damages could be inferred from the complaint because the plaintiff alleged that he would not have paid money if he knew at the time of his payments that the defendant did not intend to ever provide him with the benefits he expected in return for the payment). Therefore, the Court denies the motion to dismiss Count III.

### C. Tortious Interference with Oral Contract against Atlantic (Count IV)

In Count IV, MG alleges that Atlantic interfered with MG's oral contract with the CoStar Defendants. "To establish a tortious interference with contract claim under Illinois law, a plaintiff must show: '(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and

unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Douglas v. Lofton*, No. 12 C 8592, 2013 WL 5940749, at *4 (N.D. Ill. Nov. 6, 2013) (quoting *Hess v. Kanoski & Assoc.*, 668 F.3d 446, 454 (7th Cir. 2012)).

Atlantic argues that MG fails to allege an oral contract between MG and the CoStar Defendants. As discussed above, MG plausibly alleges the definite terms of an oral contract between MG and the CoStar Defendants. Further, MG alleges the offer, acceptance, and consideration of the oral contract by alleging that Patenaude agreed with MG for MG to design and build a trade show exhibit in exchange for payment. Atlantic also joins in the CoStar Defendants' argument that the oral contract is barred by the statute of frauds. Again, as discussed above, the Court finds that the primary purpose of MG's alleged oral contract was the design of the exhibit, not the delivery of goods, so the UCC's statute of frauds does not apply at this stage. Therefore, the Court denies Atlantic's motion to dismiss Count IV.

### D. Tortious Interference with Business Relationship against Atlantic (Count V)

MG also alleges that Atlantic is liable for tortious interference with MG's business relationship with the CoStar Defendants. "In Illinois, the elements of a claim of tortious interference with a business relationship or expectancy are: (1) the claiming party reasonably expected to enter into a business relationship; (2) the other party was aware of the claiming party's expectation; (3) the other party purposefully prevented the claiming party's business relationship from developing; and (4) the claiming party has suffered harm as a result of the other party's interference." *Maurice Sporting Goods, Inc. v. BB Holdings, Inc.*, No. 15-CV-11652, 2017 WL 2692124, at *6 (N.D. Ill. June 22, 2017) (citing *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417 (7th Cir. 2009)).

28

Atlantic argues that MG fails to allege that it had a reasonable expectation of a business relationship with the CoStar Defendants or that Atlantic knew of the reasonable expectation. MG alleges that based on its prior work on Apartments.com projects and its conversations with Patenaude, MG expected that it would build the tradeshow exhibit based on the Design Renderings. Doc. 39 ¶¶ 2–3, 33–34. MG also alleges that because Atlantic was "familiar with custom and practice in the tradeshow exhibit industry," Atlantic knew that MG expected to perform all follow-up production work related to the exhibit after completing the Design Renderings. *Id.* ¶ 96. Therefore, it is reasonable to infer that when CoStar asked Atlantic to build the tradeshow exhibit using MG's Design Renderings, Atlantic knew that it was taking business that normally would have gone to MG, who had designed the exhibit. Therefore MG plausibly alleges that MG had a reasonable expectation of future business to build the Las Vegas exhibit and that Atlantic knew that MG had such an expectation.

Atlantic also argues that MG's tortious interference with business expectancy claim fails because Illinois recognizes a "competitor's privilege" for lawful competition. *See Belden Corp. v. InterNorth, Inc.*, 413 N.E.2d 98, 102, 90 Ill. App. 3d 547, 45 Ill. Dec. 765 (1980) ("The rights of others most commonly take the form of lawful competition, which constitutes a privileged interference with another's business."). "Under Illinois law, commercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019, 227 Ill. 2d 381, 317 Ill. Dec. 855 (2008). But because the competitor's privilege is an affirmative defense, which a plaintiff need not anticipate in the complaint, "[f]ederal courts . . . have not required plaintiffs to overcome the competitor's privilege in the complaint itself." *Serv. By Air, Inc. v. Phoenix*

*Cartage & Air Freight, LLC*, 78 F. Supp. 3d 852, 869 (N.D. Ill. 2015) (collecting cases).

Therefore, the Court denies Atlantic's motion to dismiss the tortious interference with business

relationship claim in Count V.

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the CoStar

Defendants' motion for reconsideration and to dismiss [44] and denies Atlantic's motion to

dismiss [46]. The Court dismisses Count II against the CoStar Defendants for lack of personal

jurisdiction. All Defendants must answer the First Amended Complaint by August 18, 2017.

Dated: July 19, 2017

SARA L. ELLIS
United States District Judge